I've noted there are a number of lawyers, just real quick before we begin, for the Goss-Jewett and the appellees, how do you want to separate your time? Good morning, Your Honor. Yes, Matt Burris. Can you just come up to tell me this? Yes, Your Honor. I'm Matt Burris. I represent the interveners. We have amongst ourselves Mr. Lape on the far end would like two minutes, Mr. Van Vlier in the middle would like two minutes, and I would take the remaining 11 minutes of our time. Okay. I'll try to watch it, but you all will have to monitor. We'll do our best. Thank you, Your Honor. Okay. Thank you. I just wanted to know. All right. So with that, I think we're ready to proceed. May it please the Court, I'd like to reserve four minutes for rebuttal, please. Good morning, Your Honors. My name is Brett Stone, Paladin Law Group Counsel for Appellant. You will also notice that I am also a member of the LLC that purchased the subject property. I acknowledge that this is not the usual case. My partner and I have a side business where we invest and redevelop in brownfield sites. We never intended to represent Daniel Rubin. We approached him and his counsel regarding the property, and when we discovered later that the Goldberg v. Arns case existed, was on the inactive docket, we asked about it and informed Mr. Rubin, and he asked us to pursue it. And so we did. We attempted to revive that case, but the district court dismissed it for lack of prosecution. The judge was concerned that there was too much. As you mentioned, there's conflict discussions that have probably taken place, but that's not, I don't think, before us today. It's not before you, but yes, Your Honor, of course, there was conflict waivers, and counsel reviewed and approved those. Okay. The judge was concerned that there had been too much uncertainty, discovery was lost. She feared that the parties to that first action, the Arns action, would not know that it had become active again. So the case was dismissed without prejudice. We took that as a cue from the judge to start a new case and give the parties the benefit of service of a new summons and complaint. And while we followed the judge's cue, it's important to note that none of the issues presented here today on this appeal would have been issues if the Arns action was allowed to continue as it should have been. We carefully drafted the new complaint, made sure we followed all of the elements of equitable tolling and continuing harm. We tracked those tests. We pled those tests. And naturally, we were surprised when the same judge soon after dismissed many of those causes of actions on the grounds of statute of limitations and laches. This effectively turned her first judgment without prejudice to a judgment with prejudice because we could not have possibly known that this would happen. It effectively was tantamount to a dismissal with prejudice, which is improper for a dismissal for lack of prosecution. In any event, laches is not a defense in environmental cases. This is especially true in nuisance cases because the code makes it quite clear that no lapse of time can legalize a public nuisance. RCRA is based in nuisance, and we have been unable to find any case where a court has barred a RCRA claim on the ground of laches. This court should not be the first. Given the roots of nuisance, it makes perfect sense that RCRA should follow the same rules as public nuisance. Laches should not be a defense. Otherwise, congressional intent about seeking an abatement of an imminent and substantial endangerment would be thwarted. Let me ask you, with regards to the dismissal of your trespass and nuisance claims, which you were just mentioning under the doctrine of laches, is there any California law to support your assertion that the defense of laches cannot be applied to environmental claims? Well, are you referring to environmental claims, or you specifically mentioned nuisance and trespass claims? Right. It seems to be the driving principle deriving from federal law, but these are state claims, and so I'm just trying to figure out authority-wise what you're relying on. Sure. As I mentioned, Your Honor, the matters are overlapping with nuisance and the federal laws. They're driven by nuisance, but the idea is to protect the public, and the statute in California, it's Code of Civil Procedures, Section 3490, I believe it's cited in our briefs, expressly says that no lapse of time can pass to legalize a public nuisance. And the reason is really clear. The idea is we can't just let time go by and let the public suffer. On the trespass, there's a reference to continuing trespass, and I'm trying to understand what that means. Can you help me understand what you mean when you say continuing trespass? Yes. Continuing trespass. And is that based in the law? Yes. Continuing trespass and continuing nuisance are common cause of actions pled in environmental cases like this one because the damage is continuing to move and spread in the environment. In fact, it is constant, and it's moving, as we speak, off-site, furthering the dangers to public health and the environment. And the law in California is the three-year statute that would otherwise be applicable for damage to real property continues to run as long as that damage continues to take place. The trespass is still happening. A question regarding the equitable tolling. What facts can you point to on the face of the operative complaint that demonstrate the reasonableness of the plaintiff's delay in prosecuting the ARNs action? Well, the first few paragraphs on the complaint, and those are quoted in our opening brief, speak to the fact that this was the party's work on this. They were led to believe that the Goss, Jewett, and related entities were working on an interim remedial action plan, that they were communicating with the DTSC. Al Goldberg died within a few months of the filing of the original action. Betty Goldberg developed, you know, frankly became old, went into a home, and developed Alzheimer-like symptoms. And so the idea of it, it was just sort of the grandson, Daniel Rubin, knew nothing about the previous lawsuit. And, in fact, it wasn't until we were in the due diligence phase of a real estate transaction until we had heard about it. Refresh my memory. When did your LLC buy this property? The, it went into escrow, or the purchase and sale contract was executed in 2013, in October 2013.  1994. Well, the original lawsuit was filed in 1994. We discovered the 1994 ARNs action in early 2014. And when we did and got the necessary substitution of attorney, we filed that as well as a request for a status conference and asked the court to activate the case, to move it from the inactive docket to the active docket. So you filed, that's when you filed the amended complaint? No, we filed, you have to understand, Your Honor, this is actually a second lawsuit. That lawsuit, there was an order to show cause. Yeah, I remember that, yeah. So after that. You filed an entirely new case. We were essentially led to do so with the dismissal without prejudice, thinking that we, that the judge was targeting for us. This is going to be fine. It's without prejudice. File your new lawsuit. Everything is going to be told, but the parties will get the benefit of service. We'll just make sure that everything's clean this time. Discovery had been lost. Who knows who has what documents? And ultimately, the case developed. Counsel, Judge Gould, if I could interject, please. I would, before you use up all your time, like to ask you to address the federal limitations periods that are pertinent. Because my understanding is that on the RCRA statute, there is no limitations. That is correct. So it's only a question of latches, and it's a question of first impression that we don't have a federal authority on, right? You are correct, Your Honor. Okay, and then on the CERCLA claim, my understanding is that the limitations provision under CERCLA is explicit, that the time would run from the completion of the cleanup. That is correct, Your Honor. Am I right that no cleanup has been completed on this matter? That is correct. Under CERCLA, Your Honor, there only can be one removal action. That is not a case of first impression. In fact, the cases are uniform, and it's well settled that there can only be one removal action. And here it is undisputed that that removal action is not complete. Okay, so those are the federal statutes. On the state law claims, is the authority clear in California that latches should not apply to nuisance and trespass, or are there issues that should be certified to the California Supreme Court? Your Honor, no, I do not believe that certification would be necessary. Trespass cases tend to follow nuisance cases, and the law of public nuisance is quite clear that there is no lapse of time that is permissible. No matter how long you wait, we need to address this public nuisance, so long as the public nuisance continues to exist. Now, hypothetically, let's say that the public nuisance no longer existed, and it's undisputed that it does. But let's say that time had passed since then. Well, maybe then there would be a position where you had sat on your rights. But here, the public continues to be at risk. Are the chemicals from the dry cleaning still on the property? Yeah, just to clarify, it's not from a dry cleaning plant. It was from a chemical supply company that supplied dry cleaners. It's the same solvent. There have been excavations and testing performed on the property. There are monitoring wells on the property. There are monitoring wells off the property, but the plume of contamination extends quite far from the property itself. Can you give me the sites to the cases here, saying there can only be one removal action, like you just mentioned right now? What are the citations? Sure. I just want to make sure. Yeah, there's one right in the Ninth Circuit, and that is—I'm trying to remember the name of it. I'm sorry. I know I have it here. If I don't have it right in front of me, and it is in our briefs, I can identify it to you on rebuttal. And then the second one is— I just want to know what that case says is one removal action because— This is the California versus ALCO PAC site, and that's from the Central District of California. And this says there are only two phases of cleanup, the removal phase and the remedial phase, with the demarketing line between the two being the adoption of a final remedial action plan. And there are also—it's also the Neville case, which is probably what Judge Gould is referring to, and that's the one that says until that removal action is completed, then you haven't reached the remedial action. And so, Judge Gould, are you done with your questions for right now? Yes, I think I am. Okay. I have a question I want to ask before your time is up. Have there been payments made by the Goldberg Estates, not the Goldberg Trust, but the Goldberg Estates since 2012?  Yeah, this is an issue that was confusing to the district court, I believe, and it's a misnomer that the assets that are placed into the trust are not assets of the estate. Whatever Betty Goldberg put into her trust is Betty Goldberg's money. And when she received that money from a gift, from income from the property, from anywhere else, and she spent that or put it in her trust and then spent it, it's no different than me having a deposit into my trust account from my employment and then writing a check to pay for the mortgage, the groceries, the car payment. It's my money. I can do whatever I want with it. It was Betty Goldberg's money. She could do whatever she wanted with it, whether it came from the trust, her purse, under her mattress. It didn't matter where it came from. It was Betty Goldberg's money. The only difference was once she was deceased, we call it the estate of Betty Goldberg. That's the central difference. So the trust converted to the estate? I wasn't involved when there was estate planning, nor am I an estate planning lawyer, but it's clear to me that a trust is not a separate legal entity. And the plaintiff in this case is Daniel Rubin as the successor in interest and the personal representative of his grandparents, the Goldbergs. And the money that he testified that he used to and the money that we submitted as evidence of response costs were from checks drawn from the Betty Goldberg trust, but the funds in there were from the funds from rent from the property that was held by Betty Goldberg. Why wasn't the trust joined as a party then? I don't believe that anyone knew that this would become an issue. When we followed the lead, as I said, filing in the new action from the ARNs action, we were very careful to make it as close to the same complaint as possible in the same order of the cause of action and only add our new cause of action that we sought to amend in the ARNs case. And so we were very careful to leave things as the same as they were for purposes of the equitable tolling doctrine. I know I'm out of time and I did reserve some for rebuttal, but I will be back if you'll allow me. I'll see about that. We'll see. Thank you. May it please the court. My name is Matt Buras. I represent a group of insurance carriers who intervened on behalf of their insured, a suspended corporation and the estates of two individuals, Mr. Shack and Mr. Foreman. As I mentioned to the court, my colleagues, Mr. Lape and Mr. VanVleer, would like to occupy the last four minutes, so I'll try and be as brief as possible. But to finish up or to begin where the court was finishing up on the issue of costs, it is critical under CERCLA analysis to determine who incurs the costs. The CERCLA statute indicates that any person who has incurred response costs may recover them if you follow through with the lawsuit. And if you dot all the I's and do everything like that. But it's driven by who incurred the costs. And it's apparent that the trust was created as a vehicle to avoid probate. How do we know this? We know this because the probate documents that were filed in connection with getting Mr. Rubin obtaining permission to rid his family of the property, they had to list what the assets were. And I apologize, I don't have the site to the excerpts of the record, but the papers are in the excerpts of the record. And it lists no assets. There is no trust account that is listed there to indicate assets that are otherwise at the disposal of the now-deceased Mrs. Goldberg, whether originally kept under her bed, in her purse, or elsewhere. The trust is a separate entity, and it always has been. And they knew that it was a separate entity when it came time to conclude the conveyance of the real property. Because they had to readjust their purchase and sale agreement with Mr. Rubin so it accurately reflected who conveyed the property. Counsel, were there remediation costs incurred by somebody in connection with this site? By somebody at any point in time, Your Honor? I think it's fair to say that more recently that there probably have been response costs incurred. Okay. Do you know the amount, approximately? The amount that has been spent recently? No, I do not know that, Your Honor. By whom? And by who? I believe that the 220 LLC has, if it hasn't paid, has at least done work at the site. That's Mr. Stone's LLC. So did the estate of the Goldbergs or the trust incur any response costs? And that's an interesting question. With respect to the estates of the Goldbergs, there's no admissible evidence of them having paid any response costs in the 1990s when they were alive. With respect to the trust, and this is where the plaintiffs were caught in presenting false evidence to the district court, they presented evidence on behalf of the estates that they had paid response costs when, in fact, it was the trust who had paid Best Best and Krieger and the trust who had written checks to, and I think it's an environmental consultant whose name escapes me currently. So those funds went from the trust account to those folks. But the trust is not a plaintiff here. The trust has never been a plaintiff here. And in all the transactions, they have striven to keep the trust and Betty Goldberg separate. They did it when they had the real estate purchase agreement. They did it in connection with the probate filings and correcting the title to the property. They are and should be treated separately. And more importantly, the trust didn't sue. And equally importantly, when we talk about leave to amend, it was never requested. They requested leave to amend previously, which was rejected, and we think correctly. But even associated with that, there was never a request for leave to amend to add either the trust or Mr. Rubin. Was there an evidentiary hearing before the district court dismissed the Arnn's action for failure to prosecute? I'm trying to figure out if that dismissal made sui sponte, if it was made sui sponte or upon motion by one of the parties at that Rule 26F conference. I was not at that conference. My understanding, however, from having read the papers, is that Mr. Stone sought to revive it. The court issued an OSC raid dismissal in response to which Mr. Stone raised a number of arguments, including pointing out the dangers of lost testimony as a result of the passage of time. At the hearing on that, and I just don't recall, Your Honor, whether any opposition was filed to that, the court dismissed the 1994 action without prejudice. Then this action followed. So the other question I had, what's the justification for arguing that there were two removal actions in this case, you know, for purposes of recovering costs under CERCLA? I'm trying to figure out how the 2012 actions are separate or distinct in any way from the actions in 1990s, and what's your best authority for dividing the removal action up in this way? Certainly, Your Honor, and there are several questions that I understood, and I think it begins with a premise that I need to correct. Judge Gould asked whether the statute of limitations begins to run on a CERCLA claim on completion of the cleanup. That's an inaccurate way to state it. There are two types of CERCLA costs. Everything before you have a remedial action is removal. That's correct. And typically, the remedial action begins on approval of the wrap. To answer your question directly, Your Honor, about the distinction between removal actions and whether there is only one removal action, I would agree there is a presumption that all actions that are taken are part of one removal action. But that presumption does not establish a prohibition of finding two removal actions. And I think that if the Court were to take a look at the DTSC v. Neville case, or if you take a look at the ALCO Pacific case, and ALCO Pacific may be better, the DTSC in that case engaged in an eight-year preliminary cleanup. But it had three distinct events, and again, everything was being done in a coordinated, phased, logical, supervised manner. The DTSC first removed drums, then removed radioactive waste, and then removed structures. And also in that case, the plaintiff was a state agency. Was there a consent decree in that case? I don't remember that detail, Your Honor, but the DTSC was doing the work. And the challenge was whether or not each of those three phases should be split up. And we would agree that each of those three phases should not be split up into three separate removal actions. But no case, none cited by appellants, none cited by us, says that you are prohibited from finding two removal actions. There's no case that says that you should link a period of 17 years of inactivity where there's no work that's being done, there's no regulatory oversight, nothing is being done in phases. And indeed, this is the very danger that was raised, I believe, before the Sixth Circuit in the E.I. Kelly v. DuPont matter, where there was the clear fear that was raised of somebody attempting to raise a long-dead claim simply by initiating another removal action. Indeed, the actions taken in the 1990s and those being taken currently have only one thing in common, and that's the location, not the parties, nothing else. And do you agree, I guess I'm trying to understand, do you agree where the elements of latches have been met, that the application of latches under federal law is discretionary and the doctrine is supposed to be used, at least in my understanding, sparingly in environmental cases? I agree that as a general premise, latches is to be used sparingly in environmental cases, but it requires understanding what we're talking about in those circumstances. Most typically, the cases where latches are raised fall under NEPA, and it's a challenge by a citizen group to whether or not some branch of the government has actually done what it's supposed to do in evaluating approval of a government project before it happens to properly assess all of the environmental impacts. And in those cases where the government is acting and approving something and the action is being taken to protect everybody's rights, latches is applied sparingly. But in the context such as this, where we're talking about a private party, indeed a private party who's not even doing work, who's not under anybody's supervision at this point in time, who then decides, okay, I'm going to sue again 17 years later, latches, the elements of latches certainly do apply, particularly where we have somebody else who now owns the property. And moreover, there was a misstatement that I would like to correct. The concept that latches is not a defense to public nuisance in California, that's just incorrect. And I would cite the court to the case of Pichello, which is cited in our briefs. Now, it's true there's a general presumption against using latches as a defense to public nuisance. But again, that presumption applies particularly strongly where the government is acting to protect everybody's interests. But even in Pichello, where a permit was denied and they were attempting to declare a public nuisance, a public entity was held precluded as a result of latches from attempting to enforce its interests. What about Wade v. Campbell in City of Turlock v. Bristow? Old cases. I don't know if you're familiar with either of them. I'm looking to see if I have a note on it if you give me just a moment, Your Honor. Wade v. Trimble? Wade v. Campbell. It's a 1960 case. Yes, I'm sorry. Turlock v. Bristow is a 1930 case. Those cases seem to hold that latches cannot bar a nuisance claim. And again, we have a public entity that is coming in in most of the cases, whatever the activity that was being undertaken was not permitted in the first instance. Golden Gate is a good example of this, where there was an improper installation of basically a beach club, and it wasn't permitted from the onset. And they were notified that it wasn't permitted. Unfortunately, the regulators waited a while to come back, but they said, you were never permitted, it was never authorized, therefore we're enforcing. And again, I would distinguish very, very clearly between the government exercising its proper policing powers to oversee a matter of general public importance versus a private litigant who sits on their rights and does nothing for 17 years. Yes, Your Honor? I'm sorry, you keep coming back to the private, but it seems like here, public policy and the purposes of the statute weigh in favor of not applying latches in RCRA context. And here, I know you said it's a private party, but air that contamination is seeking into the groundwater, that seems public and not private. It is, Your Honor, and I have two responses to that. First of all is the activity of the DTSC at the site, which is noted throughout the record. Second, to the extent it's of an interest to the public, which is being addressed by the DTSC's involvement, where were they for 17 years? Now all of a sudden it's important and they're going to cry public interest? Clearly that's not the motivation in this case. And clearly the 17-year gap, there's no excuse for it. None has been offered. I did. Thank you, Your Honor. Thank you, Your Honor. May it please the Court, my name is John VanVleer and I represent appellee Daryl Merritt. I have but one focus point to make. Mr. Merritt, who is here in the courtroom today, was a former officer, et cetera, of Goss Jewett. After not naming him in the original 1994 lawsuit, Goldberg sued Mr. Merritt here personally, but 17 years late. He has been prejudiced by plaintiff's massive delay. Number one, evidence has been lost that would help him exonerate himself. Documents showing his lack of involvement in Santa Barbara events, witnesses that would have testified to his limited inventory control role in Santa Barbara, and memories. As sharp as he is, it's unfair for the nearly 73-year-old Mr. Merritt to have to recapture detailed memories after plaintiff's caused such a long delay. And the contamination has migrated at least 17 years further. This is significant since the essence of the case is for cost recovery and damages related to the migration of solvents, including the groundwater. This is fundamentally unfair and against our system of due process. Mr. Stone earlier today said none of these issues today become an issue if the original arms action was allowed to have continued. Yes, it would have, as to Mr. Merritt, who was not named in the original arms lawsuit. Please don't let extreme procrastination when there are real lives there being prejudiced. Any questions? Do you have... Very briefly, Your Honor. The issues that... Mr. Lape. Mr. Lape, Gary Lape on behalf of Appley Donald George, and the issues that apply with respect to Mr. Merritt apply with somewhat greater force with Donald George. The Exhibit 2 to plaintiff's complaint... Who is Mr. George? Donald George was a part owner of Tri-County Sales. According to the Exhibit 2 to the original complaint in this action, Tri-County Sales was an owner of the property prior to the time it was sold to Goss-Jewett or Goss-Jewett acquired Tri-County Sales. Mr. George's involvement was that he was an owner of Tri-County Sales, and this is in Exhibit 2 to the complaint in the action, between 1968 and 1974. So Judge Fisher-Below was concerned both when she made the order dismissing the arms action and also in talking about latches in the second action, about the specific issues with respect to Mr. George, who is in his late 80s. Because certainly, as she indicated in the original order dismissing the first case for lack of prosecution and the prejudice involved in that case, that there were memories that had been undoubtedly degraded in the intervening 17 years and documents have almost certainly been lost or destroyed, and that applied all the more so with respect to Mr. George. So here on the one hand, we have Mr. George, who's 85 years old, who didn't have involvement with the property since 1974 and then didn't have any involvement with respect to the action since it remained inactive in arms between 1994 and 2011, and all of that inactivity. And whatever was happening at the property for that 44 to 50 year period of time, not just 17 years, but for that 44 to 50 year time, is in the hands of the Goldbergs, it's in the hands of the ostensible plaintiff, Mr. Rubin, who comes in to litigate the matter. So maybe in some circumstances, latches should be utilized and applied sparingly. But I submit that with an 85-year-old man who hasn't had any involvement with the property since 1974, and given the determinations made by the district court judge, that determination should be upheld by this court. Thank you. I don't think you have any more time. I don't. Okay. Thank you. And I will give you a minute 30. Sure. Thank you, Your Honors. I appreciate it. I do want to address the idea that the probate, going back into the probate court, at the transaction to correct the title and receive permission to sell the property, the reason there was no assets goes to Goldberg's loss of use contention under the contract, which is also subject to the appeal, also subject to statute of limitations. In 2014, when DTSC provided notice to Mr. Rubin as the Goldberg representative that the indoor air levels at the property were so high that he should really make repairs or vacate his tenant, he put his tenant on notice, and the tenant stopped paying rent. Stopped paying rent and stayed on the property in possession for 15 months. No rent was paid. There was nothing left in the trust because there was no rent payments. That's why there were no assets. How do your clients have standing here? I mean, as I understand it, the estate has not paid any remediation costs as it relates to this. I mean, is this all sort of prospective? I mean, help me sort that out. Most of, Your Honor, most of our claims here are prospective. Recall the Goldbergs themselves, while they were alive, spent money on environmental consultants in the 1990s. And a lawyer or a lawyer. And lawyers. And in the 2012 time period, the representatives of the Goldbergs, through using trust assets earned from the estate's property, spent money again on environmental consultants. And there can only be one removal action. So the key here has always been prospective. We spent what money we could. We have nothing left. This is a really big problem. We want injunctive relief. We want declaratory relief that someone else is going to take over this burden, those who actually caused the contamination in the first place. Because CERCLA has two goals. One is let's get these hazardous waste sites cleaned up. And the second one is to make the polluters pay. And that's why we're here. And that's why we're on appeal. Because that's the way the law was created. That's the way the law should be. And that's what we request from your honors. All right. Judge Gould, do you have any other questions? No questions. Thank you very much for your arguments and presentations today. The case of the estate of Betty Goldberg and the estate of Al Goldberg v. Goss Jewett Company, a vigilant insurance company, is now submitted.
judges: Gould, Murguia, Christensen